UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.

BENZO ELIAS RUDNIKAS

Plaintiff,

v.

Mercedes Gisela Gonzalez (Artiles), in her individual capacity
and capacity as the Personal Representative of the Estate of Elias B. Rudnikas.

Defendant,

Maria Mercedes Rudnikas,

Defendant,

Luis Lester Rodriguez,

Defendant.

FILED BY_____D.C.

MAR 27 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

_____/

## VERIFIED COMPLAINT

Comes Now, Plaintiff, Benzo Rudnikas, ("Plaintiff") and pursuant to the Federal Rules of Civil Procedure and the Local Rules of the Southern District of Florida, hereby sues Defendants and states the following:

## PARTIES

1.  Plaintiff, Benzo Elias Rudnikas, is a twenty eight year-old male residing in Miami-Dade County at **2431 SW 63ʳᵈ Ave, Miami, FL 33155** and is the son of Elias Benzo Rudnikas (deceased on November 17, 2021) and grandson of Marta Santander Rudnikas (incapacitated).

2.  Defendant, Mercedes Gisela Gonzalez (Artiles), is a 65 year old female who resides in this judicial district at **1831 SW 93ʳᵈ Place, Miami, FL 33165**. She is the ex-wife of Plaintiff's father from thirty years ago. While Plaintiff's father was married to Mercedes, Plaintiff's father cheated on Mercedes with Plaintiff's mother and conceived Plaintiff. Since

then, Mercedes G. Gonzalez (Artiles) has always had animosity towards Plaintiff and Plaintiff's mother. Unbeknownst by Plaintiff until recently, Mercedes G. Gonzalez (Artiles) is closely associated with Victor Simons-Felix. Between 2020-2021, Victor Simons Felix was federally indicted and convicted in the United States District Court of Puerto Rico on charges related to defrauding a bankruptcy Court, asset concealment, and perjury. The indictment/information sheet and articles of incorporation can be found on pacer under "Victor Simons-Felix d/b/a S.M Medical Services and the Puerto Rico division of corporations for "Continuous Express Pharmacy" which this Court can take judicial notice of. That said, Mercedes is also the current purported named Personal Representative of the Estate of Elias B. Rudnikas. Plaintiff sues her in her individual capacity and in her capacity as the Personal Representative of the Estate. As will be shown, the probate Court lacks subject matter jurisdiction and Mercedes G. Gonzalez (Artiles) obtained her Letters of Administration through violations of the Federal Computer Fraud And Abuse Act that she committed from as early as November/December 2021 and onward.

Defendant, Maria Mercedes Rudnikas, is the daughter of Mercedes Gisela Gonzalez and resides at **1831 SW 93rd place, Miami, FL 33165.**

3. Luis Lester Rodriguez is a Defendant in this matter solely as to the tortious interference with an inheritance supplemental claim. Luis Lester Rodriguez resides in this judicial district. Upon information and belief, Luis Lester Rodriguez resides at **6715 SW 85 Ave, Miami, FL 33143**

### **JURISDICTION & VENUE**

4. This is an action for declaratory relief, injunctive relief, & damages pursuant to 18 U.S.C. § 1030 *et seq* for claims brought under the Federal Computer Fraud and Abuse Act.

5. This is also an action for tortious interference with an inheritance.

6. The damages are in excess of $75,000.

7.This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 for the claims arising under Federal Law and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims.

8. Plaintiff seeks punitive damages under the maximum statutory amount of $2 million under Florida Law for the tortious interference for intentional misconduct by Luis Lester Rodriguez and Mercedes G. Gonzalez (Artiles) in addition to the compensatory damages.

10. Venue for this action vests pursuant to 28 U.S.C. § 1391(b) in that Defendant is situated in this judicial district and the cause of action accrued in this judicial district.

## PROBATE EXCEPTION DOES NOT APPLY

As a preliminary matter, it is important to note that the probate exception does not apply to the instant case because Plaintiff is invoking federal question jurisdiction, not diversity jurisdiction. *See In re Goerg*, 844 F.2d 1562, 1565 (11th Cir. 1988) ("Care should be taken not to confuse the question of the breadth of Congress' bankruptcy power with the so-called "probate exception" to statutory diversity jurisdiction. **That exception relates only to <u>28 U.S.C. § 1332</u> (1982), and has no bearing on federal question jurisdiction**, the jurisdiction invoked in bankruptcy cases. *Cf. Covell v. Heyman,* 111 U.S. 176, 179-80, (1884) (property in custody of state court may be disturbed by federal court "exercising jurisdiction for the purpose of enforcing the supremacy of the Constitution and laws of the United States"). Owing to the supremacy clause, federal bankruptcy law preempts state law; as one of Congress' enumerated powers, the power to enact bankruptcy laws is limited only by the substantive guarantees contained in the Constitution. Whether Congress has actually exercised its bankruptcy power in a particular area is, of course, a matter of statutory construction.") (cleaned up)( emphasis added)

*See also Covell v. Heyman*, 111 U.S. 176, 179-80 (1884) ("And *vice versa*, the same principle protects the possession of property while thus held, by process issuing from State courts, against any disturbance under process of the courts of the United States; **excepting, of course, those**

**cases wherein the latter exercise jurisdiction for the purpose of enforcing the supremacy of the Constitution and laws of the United States.") (emphasis added)**

## THE PROBATE COURT LACKS SUBJECT MATTER JURISDICTION

As a secondary initial matter, it is important to note that the Probate Court currently lacks subject matter jurisdiction for several reasons:

First, the probate Court lacks subject matter jurisdiction because the purported personal representative, Mercedes Gonzalez, did not deposit the will within 10 days of having knowledge of the testator's death which occurred on November 17, 2021 despite being aware of his death the day he died. In fact, she did not deposit the will until nearly two months later on January 14th, 2022. Florida Statute 732.901 is a statute of non-claim.

Florida Statute 732.901 states in pertinent part:

"Production of wills—

(1)   The custodian of a will must deposit the will with the clerk of the court having venue of the estate of the decedent within 10 days after receiving information that the testator is dead. The custodian must supply the testator's date of death or the last four digits of the testator's social security number to the clerk upon deposit."

 The fact that the statute is a statute of nonclaim is made clear by the legislature's amendment of the statute in 2013 when they chose to amend other parts of the statute, but deliberately did not amend the 10 day requirement. Further, the fact the 10 day statute is a statute of non claim is supported by the Florida Legislature's  passing of the Florida Fiduciary Digital Access Act of 2016 wherein the last section of the statute, the Florida Legislature again affirmed the 10 day requirement. See Florida Statute 740.11 which states in pertinent part:

**"740.11   Relation to wills.—**No act taken pursuant to this chapter is valid to affect the obligation of a person to deposit a will of a decedent as required under s. 732.901."

Consequently, the Probate Court currently lacks subject matter jurisdiction and entire proceedings thus far are void *ab initio* under Florida Law. Further, Defendant, Mercedes G.

Gonzalez (Artiles), not complying with the requirement of depositing the will within 10 days of having knowledge of the testator's death, also means she is not afforded the protections that would have been afforded to her under the 2016 Florida Fiduciary Digital Access Act from violations of the Federal Computer Fraud and Abuse Act and related federal privacy laws.

Second, the probate Court lacks subject matter jurisdiction because Mercedes G. Gonzalez (Artiles) did not comply with the requirements of the Order Admitting the Will to Probate nor the Order Granting the Letters of Administration nor Order Designating Restricted Depository that her appointment was contingent upon. These requirements, included but were not limited to, depositing all estate assets into the restricted depository within 30 days. Rather than comply, Mercedes instead, chose to misappropriate bank checking/savings accounts, life insurance polices/retirement accounts/revocable living trusts, and comingle estate funds with her own personal bank account that she has no authorization/access to misappropriate.

Third, the probate Court also lacks subject matter jurisdiction because Mercedes never complied with the jurisdictional requirement of serving a Notice of Administration on Plaintiff's grandmother nor Plaintiff despite knowing that the proceedings were adversarial at the time she filed for probate as evidenced by her attempts to construe the Will in the petition to determine homestead filed wit the probate Court in January 2022 and her probate attorney's latest attempt to construe the Will to Plaintiff's detriment in March 2023 in a filing with the Probate Court title " Motion to Strike/Discharge Lis Pendens"

Fourth, the probate Court lacks subject matter jurisdiction to the extent that the property that is the subject of this complaint is not listed in the inventory and was never in the custody of the Probate Court. More specifically, the law practice and it's assets were never probated and were deliberately not listed in the inventory. This in addition to the Wells Fargo Revocable Intervivos Trust, Bright house life insurance policies, and chase bank accounts belonging to Plaintiff's grandmother. The fact that the law practice was deliberately not included in the inventory is made clear by the fact that Defendant, Mercedes G. Gonzalez, shredded thousands of documents and gave away the law practice and it's assets to Stokes & Gonzalez in December/January 2021 before Probate was even filed for. She also gifted/trafficked the passwords of the domain websites of Elias B. Rudnikas in April 2022, *the same week the inventory was filed* to Stokes &

Gonzalez, P.A. Specifically, Stokes & Gonzalez took over domain names and websites in April 2022 by using the passwords and usernames that Mercedes Gonzalez illicitly gave them without authorization and trafficked in violation of the Federal Computer Fraud and Abuse Act. Stokes & Gonzalez then kept everything the same on the websites of Plaintiff's father: sealaw.com and leymaritima.com with the exception that they replaced their own names on the homepage of the website wherever it said the name of Plaintiff's father. They also took down rudnikas.com from April 2022-August 2022 and simply had the domain forwarded to Stokes & Gonzalez's website. Plaintiff has a video that he incorporates by reference and will file with the Clerk of Court at the appropriate time at an evidentiary hearing/trial. They did this without paying any royalties to Plaintiff who inherited his father's right to publicity under Florida Law, not Mercedes G. Gonzalez (Artiles). Mark Stokes & Jacinto Gonzalez owe Benzo Elias Rudnikas royalties for commercializing his name. This will be addressed in another lawsuit or an amended complaint at the appropriate time.

Fifth, the probate Court lacks subject matter jurisdiction because the entire proceedings are *void ab initio* due to the intentional violation of Marta Santander Rudnikas's 14th amendment constitutional right to participate in the proceeding with a real guardian (without a conflict of interest) to advocate for her interests. All Defendants and potential Defendants that Plaintiff may add in an amended complaint after discovery, were aware as of November 2021 that Marta Santander Rudnikas was incompetent, that no notice of administration could be served on her, and all Defendants were aware that Marta Santander Rudnikas needed a guardian. Yet, all Defendant's made sure that a guardian was not appointed until nearly a year into the proceeding after all the assets had been nearly depleted with the exception of the real estate properties. *See Covey v. Town of Somers*, 351 U.S. 141, 146-47 (1956) ("Although she was known by the officials and citizens of the Town of Somers to be a person without mental capacity to handle her affairs or to understand the meaning of any notice served upon her, no attempt was made to have a Committee appointed for her person or property until after entry of the judgment of foreclosure in this proceeding…Notice to a person known to be an incompetent who is without the protection of a guardian does not measure up to this requirement. Assuming the truth of the uncontradicted assertions, that the taxpayer Nora Brainard was wholly unable to understand the nature of the proceedings against her property (from which it must be inferred that she was unable to avail herself of the statutory procedure for redemption or answer), and that the town

authorities knew her to be an unprotected incompetent, we must hold that compliance with the statute would not afford notice to the incompetent and that a taking under such circumstances would be without due process of law.") (cleaned up).

Sixth, the probate Court lacks subject matter jurisdiction to the extent the federal and state claims in this complaint involve intellectual property rights or the commercialization of the name "Rudnikas". Under Florida Law, the right of publicity descended to Plaintiff upon his fathers' death and Plaintiff has direct Article III standing because that is his name and Mercedes Gisela Gonzalez even offered to sell him the domain of his own name in July 2022 (cyber squatting). Further, Plaintiff never gave Stokes & Gonzalez authorization to commercialize the use of his name or his father's which is still being forwarded. The links on Rudnikas.com (once they put it back up in August 2022) for sealaw.com and leymaritima.com are still forwarded to the websites that Stokes & Gonzalez illicitly took over without authorization.

Seventh, again and above all else, as stated supra by *In re Goerg*, the Supremacy Clause of the United States controls over the probate proceedings. The probate exception only applies to diversity jurisdiction, not federal question jurisdiction.

Lastly, besides meeting the Supreme Court requirements for third party standing on behalf of his grandmother and notwithstanding the status quo at as this time,  Plaintiff states he still has direct Article III standing for the property that did not pass under the Will as well as for the Computer Fraud and Abuse Act claims.

## **VERIFIED FACTS**

11. On the morning of November 16, 2021 Plaintiff's half sister, Maria Rudnikas, called Plaintiff to inform him that his father, Elias Benzo Rudnikas had been having health issues for the past several months, suffered a major stroke the night before , and was in critical condition at University of Miami Hospital located in the Health District.

12. Plaintiff immediately asked his employer for several days off for bereavement and went to the hospital.

13. For the next two days, Plaintiff, his half sister, and the girlfriend of Plaintiff's father, Blanca, grieved Plaintiff's father at the hospital. Plaintiff's father was taken off life support on November 17, 2021 and his funeral was held on November 21, 2021.

14. Prior to his death, Plaintiff's father was a well known Florida Bar licensed personal injury and maritime attorney who had been practicing maritime law for nearly 40 years as explained below.

15. Based on a Westlaw search of Miami Dade Dockets, Plaintiff's father had been the designated Counsel in well over 1000 personal injury cases in Miami Dade, probably much more.

16. At the midpoint of his career, Plaintiff's father began to exclusively dedicate himself to the practice of federal maritime law and began to limit the amount of auto accident personal injury cases he took.

17. Throughout Plaintiff's childhood, Plaintiff's father was constantly traveling to different countries around the world including but not limited to India, Monaco, the Philippines, Panama, Romania, and basically all over the world. Plaintiff's father traveled to these different countries and would stay in each country for several weeks with the purpose of obtaining clients for his maritime practice.

18. Specifically, Plaintiff's father would pay for advertisements in the local newspapers in various languages in the respective countries he was staying at to promote his law practice. Plaintiff's father would then wait at the hotel he was staying for several weeks until he was able to retain and sign a client as a result of his advertisement.

19. Plaintiff's father also attained notoriety because he was the lead Counsel in *Lindo v. NCL Bahamas* (2011). *Lindo* is a precedent setting 90 page maritime opinion by the Eleventh Circuit and arguably one of the most important maritime decisions to ever be issued. Put in context for this Court, nearly every other maritime opinion issued by the Eleventh Circuit usually cites to *Lindo v. NCL Bahamas* (2011).

20.   Relatedly, given that federal maritime law depends heavily on the language in the employment contract/ticket between the cruise line and passenger/seaman, many cases require arbitration in a specific forum/country. As a result, Plaintiff's father had a masters in arbitration and would also have to travel to several different countries around the world in order to file arbitration claims in those respective countries before bringing any potential claim to confirm/vacate an arbitration award in a U.S Federal Court. The countries he traveled to were, by reasonable standards, considered to be dangerous and Plaintiff's father was always scared of getting kidnapped.

21. But to continue, Plaintiff's father was forced to familiarize himself with personal injury tort law of many different countries despite the language barriers and despite not having attained his law degree from those respective countries. Not surprisingly, Plaintiff's father would often spend each Sunday for many years doing just that, while Plaintiff was at his house in one room watching T.V. with his grandmother, Plaintiff's father spent the time studying tort/maritime law of various different countries.

22.   After decades of doing thi, Plaintiff's father became a well respected maritime law attorney in South Florida with his signature trademark in both English and Spanish respectively,:

" Defending the rights of the injured and the sick since 1982"

"Defendiendo los derechos de los enfermos y lesionados since 1982"

23.  Plaintiff's father had the trademarks on the domain websites he owns/owned: Rudnikas.com; Sealaw.com; leymaritima.com as well as the social media pages.

24.  Plaintiff's father spent many years dedicating hundreds of thousands of dollars to craft his websites with his trademark and various maritime articles to attract clients. The computer expert of Plaintiff's father for thirty years, Craig Simon, can testify to same. Plaintiff will file the articles under separate cover as one combined Exhibit and some are dated as to when Plaintiff's father wrote them. Plaintiff's father also owned the easy/vanity number (305) 642-5000 which is now worth over $3,000. Plaintiff's father liked this phone number because it was easy to remember.

25. Plaintiff's father's goodwill/reputation as an excellent maritime attorney became so valuable that he began to need help and would have other attorneys file maritime lawsuits for him in federal court as Co-Counsel for the client's of Plaintiff's father. In exchange, Plaintiff's father would provide them with a percentage of the winnings/settlement from the lawsuit.

26. The attorneys Plaintiff's father had this arrangement with were Mark Stokes, Esq. and Jacinto Gonzalez, Esq. of Stokes & Gonzalez, P.A.

27. Specifically, Plaintiff's father would retain the client through his goodwill/traveling and then he would have Mark Stokes, Esq. of Stokes & Gonzalez or Jacinto file a maritime lawsuit in Federal Court as Co-Counsel in exchange for a percentage of the winnings/settlement. But Plaintiff's father, Elias Benzo Rudnikas, was the lead attorney who was retained by the client in every case and the lead attorney overseeing the lawsuit. This can be confirmed by the Court by doing a party attorney search of " Elias Benzo Rudnikas" in pacer.

When conducting said search, many of the cases that are generated by Pacer, under the attorney information tab, will show that Mark L. Stokes filed the lawsuit but acknowledged that Plaintiff's father, Elias Benzo Rudnikas, was the lead attorney who was retained by the Client. In fact, even the majority of cases that do not generate with the party search of Plaintiff's father but generate doing an attorney search of Mark Stokes belong to Plaintiff's father and Mark Stokes simply did not add Plaintiff's father to the electronic service list Regardless, Jacinto Gonzalez confirmed in a social media posting that the cases belong to Plaintiff's father.

To be sure, the majority, if not all, of these maritime cases that pop up on pacer doing a party search for attorney Mark L. Stokes, but do not generate when doing a party attorney search for Plaintiff's father, Plaintiff's father was listed as Co-Counsel on the original complaint filed by Mark Stokes .Further and tellingly, the maritime cases where Mark Stokes, Esq. is the lead Counsel who was retained by the client where Plaintiff's father is not listed at all as Co-Counsel are cases where the subject Plaintiff was a resident of Miami and/or the employment contract/ticket of the Plaintiff mandated that arbitration occur in

Miami or simply did not require arbitration at all. But for cases that required arbitration in different countries or the Plaintiff was not a resident of Miami, Plaintiff's father was usually the lead attorney who was retained. This is so because Plaintiff's father was the maritime attorney who was willing to travel and had international recognition through his website as well as social media platforms as evidenced by a screenshot of his Facebook page before it was taken down that Plaintiff will file under separate cover at the appropriate time.

28. This simple arrangement with Stokes & Gonzalez continued up until the death of Plaintiff's father in November 2021.

29. Given that Plaintiff's father's had been having health issues for several months, Plaintiff assumed his father had his affairs in order as far as his will and assets.

30. Nonetheless, on November 30, 2021, Plaintiff noticed that the Florida Bar website still reflected Plaintiff's father as an active attorney rather than deceased. Concerned about his father's legacy given Plaintiff's s knowledge that other deceased attorneys have been disbarred for failure to meet CLE requirements due to the Bar's lack of knowledge that the respective attorneys had died, Plaintiff emailed the Florida Bar and informed them of his father's death and Plaintiff's concern about his legacy. The Florida Bar responded, updated the bar website, and offered their condolences. Plaintiff then forwarded the email to the service email of Plaintiff's father and addressed same to Teresa Galindo. Teresa Galindo was the secretary of Plaintiff's father for over twenty years. Teresa responded to the email Plaintiff sent and thanked him for same. Teresa Galindo was purportedly working at the Law Office of Plaintiff's father through the end of December 2021. Upon information and belief, Teresa Galindo was then hired by Stokes & Gonzalez in January 2022 for "continuity" to help Stokes & Gonzalez absorb the law practice without paying the million dollar goodwill value of the law practice and without having it probated for all of its trade secrets.

31. Shortly after, Mercedes G. Gonzalez (Artiles) trespassed his deceased father's law office located at 3670 NW 6th Street, Miami, FL 33125, accessed his protected comuters without authorization, altered the information on the computers, obtained his father and

grandmother's financial information, misappropriated their bank accounts/life insurance policies/retirement accounts, and then proceeded to shred thousands of documents in the law office that she had no authorization to shred.. This is confirmed by a statement made by Maria Rudnikas to Plaintiff admitting his mother was shredding thousands of documents and by a filing made in the probate Court by Attorney Max Lopez  on December 2022 showing Mercedes G. Gonzalez accessing his fathers computer and his law office email account on December 5, 2021 via rudnikas@yahoo.com. The filing is attached hereto. Mercedes G. Gonzalez, upon information and belief, then withdrew anywhere from hundreds of thousands to potentially millions of dollars from his fathers' bank accounts at Synovus, Chase, Wells Fargo, and BankUnited which will be verified and confirmed through third party subpoenas. She also changed the beneficiaries of life insurance policies, retirement accounts, and, Intervivos revocable trusts to herself/her daughter and rerouted them to her own bank account. The relevant documents are attached hereto.

32.  In January 2022, Plaintiff's half-sister, Maria Rudnikas, asked to meet with him at a local restaurant to speak with him regarding probate.

33.  At the meeting, Plaintiff's  half sister told him that Plaintiff's father had a will, that it was from 2007, and that the will devised Plaintiff and Plaintiff's half sister as 50% heirs to Plaintiff's father and that Plaintiff's father had named the mother of  Plaintiff's half sister, Mercedes Gonzalez as the personal representative. Plaintiff's half sister then handed Plaintiff a purported copy of the will she had just described, closed & folded. Plaintiff did not open it at the time and simply took his half-sister 's word as to it's contents. Plaintiff's half sister then asked him to sign two waiver and consent forms, one on behalf of his grandma and one on behalf of himself.

34.  Plaintiff's half sister told Plaintiff at this meeting that Mercedes Gonzalez had purportedly already quit her job as a pharmacist at Walgreens in order to be the personal representative of the estate of Plaintiff's father and she explicitly told Plaintiff that Mercedes Gisela Gonzalez had been at the law office of Plaintiff's father for the past several weeks, every day shredding documents. Plaintiff responded that a Legal Team should be in charge of that, not Mercedes Gisela Gonzalez to which Maria Rudnikas agreed with Plaintiff.

35.  At the conclusion of the meeting, Plaintiff's half-sister dropped him off at Marshall's Department Store on Coral way, near miracle mile. Plaintiff was meeting his mother, Astrid

Perdomo, at Marshall's. It was here that Plaintiff opened the will and realized it's true contents were completely different then what his half sister had told him before she signed the two waiver and consent forms.

36. Nonetheless, Plaintiff, did not make a big deal out of it at the time because at the time he believed the eventual outcome was the same given that Plaintiff's grandmother did not have a will and was already (unofficially) incapacitated due to end stage Alzheimer's and given that his half-sister seemed to be acting in good faith at the time. Plaintiff, logically and having a good perception of his estranged half sister at the time, believed that she did not tell Plaintiff of the purported will's true contents out of compassion for Plaintiff and that this was the reason why she handed Plaintiff the will folded and closed.

37. At this same meeting at the restaurant, Maria Rudnikas informed Plaintiff that she was advised by several attorneys not to file for Marta Santander Rudnikas's guardianship yet.

38. Having said that, months go by, but Plaintiff made sure to keep himself informed and updated on what was happening in the probate proceedings through the online Miami Dade County docket. During this time, Plaintiff noticed that Mark Stokes proved the forged will and that he took the oath proving the forged will. Plaintiff also noticed (later on) that all of the witnesses to the will are/were employed by Mark Stokes, are clients of Mark Stokes, or otherwise affiliated with Mark Stokes, including the notary.

39. During this time, the websites of Plaintiff's father, Rudnikas.com; sealaw.com; leymaritima.com all still showed their original content with Plaintiff's father as the attorney. Accordingly, Plaintiff assumed the practice was being evaluated for the goodwill of Plaintiff's father and was going to be in the inventory due April 2022.

40. In April 2022, Plaintiff noticed on the Miami Dade docket that the inventory was finally filed by the personal representative under seal. Shortly after, Plaintiff asked his half sister Maria for a copy of the inventory since her mom was the personal representative and since Plaintiff believed he was entitled to a copy given that he was the heir relative who signed on behalf of his grandmother giving the personal representative, her authority.

41. Plaintiff's half sister did not give Plaintiff a copy of the inventory and instead told him to speak with the personal representative. Plaintiff then emailed the attorney for the personal representative requesting a copy of the inventory and the death certificate of his father. The attorney did not respond to Plaintiff promptly and Plaintiff assumed she was not going to respond.

42. A couple of days later, Plaintiff's half sister, Maria Rudnikas, then reaches out to Plaintiff telling him that her mother, Mercedes Gonzalez, the personal representative for the estate of Plaintiff's father, plans on applying for guardianship of Plaintiff's grandmother, Marta Santander Rudnikas but that they need Plaintiff's consent in order for Mercedes Gonzalez to be appointed.

43. Plaintiff declined to provide consent and instead proposed a co-guardianship with his half sister, Maria Rudnikas.

44. In response, Maria Rudnikas became very upset and began insulting Plaintiff with baseless personal attacks because he would not agree. Mercedes Gonzalez was actively involved in procuring the communications that Maria Rudnikas sent to Plaintiff. These hostile communications to Plaintiff continued for several days and in response, Plaintiff kept it respectful and simply kept proposing a joint guardianship between his half sister and himself.

45. And more importantly, during this time period, Maria Rudnikas, in her anger sent Plaintiff a copy of a previous 1999 will that he had never seen, which looks a lot more like something Plaintiff's father executed given the initials on each page and the formal cover letter. Unlike the current forged will, in the previous will, Plaintiff's father appointed not only a personal representative , but an attorney for the personal representative as well as an alternative personal representative should the preferred personal representative die. Neither of the two personal representatives were Mercedes Gonzalez. She also insinuated that the

2014 will was not his father's last will and insinuated that the 2021 will was destroyed by Mercedes G. Gonzalez through her violations of the Federal Computer Fraud and Abuse Act. Plaintiff will file the text messages at the appropriate time under separate cover.

46. Ironically, Jacinto Gonzalez was the witness to 1999 will and Jacqueline Elliot, the same notary that notarized the current 2014 will, Mark's Stokes Legal Assistant, notarized the previous 1999 will. Teresa Galindo also put her initials on the cover letter to the personal representative for the 1999 will which was written in Spanish. Plaintiff will file the letter and will at the appropriate time under separate cover.

47. Had Plaintiff seen this will much earlier, he would have challenged the purported forged 2014 will that was procured by Mark Stokes and his employees before the 90 day deadline prescribed by Florida Probate Court. And having seen that will, Plaintiff no longer believes that the 2014 will is the real will nor the most recent will. What Plaintiff finds very suspect about the current will compared to the previous one, besides the lack of initials, lack of completeness, as well as all of the witnesses being employees/clients of Stokes & Gonzalez, was that it took Mercedes Gonzalez/Maria Rudnikas over two months after the death of Plaintiff's father to initiate estate proceedings in the probate Court when the Florida Statute clearly mandates 10 days from the date of date, meaning neither was a custodian of the will and neither had knowledge of the purported will until January 2022 after Teresa Galindo, the secretary of Plaintiff's father, went to go work for Stokes & Gonzalez and abandoned the office. This is telling because Plaintiff's father made sure in the previous will to inform the personal representative by mailing a letter, as noted by the cover letter initialed by Teresa Galindo.

48. Relatedly, Teresa Galindo's affidavit of disinterested party in the State Court proceedings does not identify a specific will by date and just mentions that Marta Santander Rudnikas was the sole beneficiary. Plaintiff assumes she was referring to the previous 1999 will since this was the will she initialed on the cover letter and the only will that shows evidence that she had personal knowledge of. .

49 Coincidentally, Marta Santander Rudnikas just happens to be the sole beneficiary in both the will that was initialed by Teresa Galindo and the second will that was not initialed her.

50.    What Plaintiff also finds suspect about the current will is that one of the witnesses, Michael Essington, a mediator, who is used by Stokes & Gonzalez and was also a former opposing counsel in maritime cases with Plaintiff's father/Stokes, purportedly signed the will in front of all the other witnesses. There are public documents in pacer showing Michael Essington holds the maritime mediations/arbitrations at his own law office. That said, Plaintiff has a hard time believing that Michael Essington drove all the way to Stokes & Gonzalez to be a witness to sign the will. By the same token, Plaintiff finds it very unlikely that Mark Stokes took all of his support staff, the witnesses and notary, to Michael Essington's office for whatever mediation/arbitration he had that day in September 2014 as co-counsel with Plaintiff's father.

51. And more importantly, during this same time period in Mid to Late May 2022 that Maria Rudnikas/Mercedes Gonzalez were opposing Plaintiff's guardianship, Plaintiff noticed that the websites of Plaintiff's father were at least, in terms of content, taken over/changed by Stokes & Gonzalez. With regards to Rudnikas.com, the entire website and it's contents taken down and now when one tries to access Rudnikas.com on the internet, it is forwarded to StokesGonzalez.com.  Plaintiff will be filing a video exhibit for the Court under separate cover and same incorporate by reference.

With regards to sealaw.com and leymaritima.com, most of the contents of both websites were kept exactly the same including the design, layout, and articles written by Plaintiff's father with the exception that Mark Stokes and Jacinto Gonzalez replaced their own names and contact information as well as the name/contact information of their law firm in every part of the website that used to say Elias Rudnikas and used to give the contact information of Plaintiff's father. Defendant's even took the trademark of Plaintiff's father mentioned *supra* and claimed it as there own, merely changed the year from 1982 to 1996. Plaintiff will attach a screenshot at the appropriate time under separate cover.

52. Plaintiff found this rather odd because an Order was entered by the probate judge that specifically prohibited selling/gifting assets without Court order.

53. Regardless, because Plaintiff had not seen the inventory yet, he did not know what to make of it. Plaintiff assumed the law practice had been sold and that the proceeds would be reflected in the inventory that were filed under seal which he had not seen yet. But to be sure, Plaintiff retained an attorney for the estate proceedings and his grandma's guardianship. The very same day he retained an attorney, he finally received a response from the personal representative's attorney, who just happens to have her law office in the same building and floor as Stokes & Gonzalez and was probably recommended by Stokes & Gonzalez. Specifically, her response gave an justification for not answering Plaintiff's email and said she would be mailing copies of both documents. Later that same day, Plaintiff then received copies of both documents via email.

54. When Plaintiff finally saw the inventory, he realized it was poor, incomplete, and haphazard. For one, it did not contain an appraised market value for any of the properties owned by Plaintiff's father and contained the same value that is used for tax purposes that was put on the original petition months earlier but most of all it had no goodwill evaluation/appraisal for the law practice of Plaintiff's father despite showing a business account and trust account in the inventory. In other words, the inventory showed the value of the bank account of a business but no business and no transaction showing that the law practice/business was sold.

55. Ironically, the next day, Plaintiff received communications to his phone from Mercedes Gonzalez, the personal representative of the estate of Plaintiff's father estate. Mercedes asked Plaintiff for any recommendations regarding an appraisal of his father's commercial building. Plaintiff used the opportunity of an open line of communication to discuss the guardianship of his grandma as well as other aspects of his father's estate including the law practice.

56. With regards to the guardianship, in good faith, Plaintiff offered Mercedes Gonzalez, a co guardianship between her and Plaintiff since Maria Rudnikas admitted to Plaintiff in multiple communications that she was not a good fit, was constantly traveling, and wanted

Mercedes Gonzalez. Plaintiff got nowhere with regards to the guardianship and instead, Mercedes Gonzalez/Maria Gonzalez tried to beat Plaintiff to the Courthouse and filed their application to be co-guardians on 6/10/22, one hour before Plaintiff filed for guardianship.

57. Mercedes Gonzalez filed for a joint guardianship despite telling Plaintiff in text message communications that same week that the guardianship had nothing to do with her and was a matter to be resolved solely by the next of kin, Maria and Plaintiff. Hence, Plaintiff has a hard time believing anything that Mercedes Gonzalez says and believes she is a compulsive liar.

58. At the end of the day on 6/10/22, around 5 pm, the same day that Mercedes Gonzalez/Maria Rudnikas and Plaintiff filed for the guardianship of Marta Santander Rudnikas, Maria Rudnikas sent communications to Plaintiff of which Plaintiff believes that any objective, federal judge would view as being discriminatory, immature, and being sent in bad faith to intimidate Plaintiff from participating in the state court guardianship proceedings because of his ongoing protected activity of prosecuting his ADA lawsuit. Plaintiff will file the communications under separate cover if the Court deems it necessary and same is incorporated by reference.

59. It was at this point that Plaintiff realized that Mercedes Gonzalez and Maria Rudnikas were only pretending to be his friend when they asked to meet with him in January 2022 at the public restaurant to discuss the probate proceedings. Plaintiff realized that what he previously thought was compassion by Maria Rudnikas was simply fraud in the inducement. This became crystal clear to Plaintiff when he began to research and really scrutinize the filings in the State Court by Maria/Mercedes as well as their filing with the Florid Department of State. Specifically, Plaintiff noticed that both Maria and Mercedes, under the penalty of perjury, sated on the petition for administration in the estate of Plaintiff's father as well as their guardianship application for Plaintiff's grandmother that Maria Rudnikas lived at the 319 bird road property. Maria Rudnikas even changed her. These actions inappropriate and a dishonest o because Maria Rudnikas has never lived at 319 bird road. In the five years

prior to Plaintiff's death, she lived in Boston for two years and Spain for the latter three years. Same can be confirmed by the Court with her passport. Prior to that she lived with her mother as confirmed by the Joint Tenancy with Rights of Survivorship filed in Miami Dade County. Plaintiff also noticed that Maria changed her voter registration to reflect her father's property and that Mercedes Gonzalez even listed Maria's address, under the penalty of perjury, as being the 319 bird road property.

60. Prior to the hearing, according to Attorney Max Lopez, Maria Rudnikas and Mercedes Gonzalez stated they would only agree to a professional guardian if Plaintiff stipulated that Plaintiff would agree not to influence the guardian in anything related to the grandmother's health or try to have his grandmother moved out of the 319 Bird Road Property. This is what Max Lopez told Plaintiff's former attorney, Teresa Hoffman.

61. The day of the hearing on July 12, 2022, Plaintiff's grandmother was declared incapacitated and Attorney Max Lopez told the Probate Judge that the parties had agreed to forego an adversarial hearing on the competing petitions and would stipulate to professional guardian, Elena George, subject to certain language in a stipulation. The probate Judge told the parties if they could not agree on the language for the stipulation, then to set the hearing on the competing petitions for guardianship for a 30 min special set hearing .In other words, on July 12, 2022, Plaintiff's grandmother was declared incapacitated but no letters of guardianship were issued. Instead an Order of incapacitation naming a "proposed guardian" was entered. At the time of the incapacitation hearing, Maria Rudnikas was in Spain. But her co-petitioner, Mercedes Gonzalez, was in Miami.

62. On Friday night of July 15, 2022, Plaintiff drove by the 319 Bird Road on his way home from work and noticed for the first time in years, that the lights were turned on in the vacant top floor separate living unit apartment: 321 Bird Road. Plaintiff also noticed that Mercedes Gonzalez's car was at the property. The next morning, Plaintiff reached out to Mercedes Gonzalez via text message about renting out the 321 bird road top level vacant apartment to provide income for the estate and asked if he could see it. It is obvious from the text message that Mercedes Gonzalez went up to the 321 bird property to move Maria's things up into the vacant apartment, so they continue with their plan of Maria Rudnikas attempting to claim it as

homestead and Maria's "residence". Plaintiff will file them under separate cover at the appropriate time.

63. The following Monday, Attorney Max Lopez, told Plaintiff's former attorney that he didn't know if the parties could still agree to a neutral professional guardian because of Plaintiff's conversation with Mercedes Gonzalez via text message in the preceding weekend.

64. In other words, Max Lopez/Maria Rudnikas/Mercedes Gonzalez, were deliberately delaying the appointment of a guardian for Plaintiff's grandma so Max Lopez could charge attorneys fees and because they wanted to have enough time for Maria Rudnikas to move in her things to the 321 top level apartment before the official letters of guardianship were issued, so Maria/Mercedes could try and claim it as homestead and influence the guardian themselves and exploit Plaintiff's grandmother of her asset that she could potentially receive rental income from.

65. Around this time frame that Mercedes Gonzalez/Maria Rudnikas, through their Attorney Max Lopez, were deliberately delaying the appointment of a guardian, Mercedes Gonzalez filed a petition for authorization to sell the commercial property of Plaintiff's father, where the law practice was located and where Plaintiff's father had all the relevant documents/information that was not listed in the inventory such as his computers, Plaintiff filed objections on his own and his former attorney withdrew from the case. Again, Mercedes G. Gonzalez (Artiles) filed this exparte petition and obtained an exparte order while Petitioner's grandmother was incompetent.

66. About a month later, a Guardian was finally appointed, but she turned out to have a conflict of interest and relinquished power to Defendant, Mercedes G. Gonzalez. Again, Mercedes G. Gonzalez, who has illicility withdrawn money from Plaintiff's grandmother's bank accounts in violation of the Federal Computer Fraud and Abuse Act. This fact will proven by third party subpoenas and is also made clear by an email sent from Michael Dribin, Plaintiff's former attorney to Plaintiff, regarding a conversation he had with Luis Barreto, Attorney for Mercedes G. Gonzalez, wherein Luis Barreto mentions that there is no money in Plaintiff's grandmother's bank account's. The email is attached hereto. Luis Barreto nor Mercedes G. Gonzalez do not have any authorization to be accessing his grandmother's bank accounts that was receiving untouched social security money for nearly thirty years and a bank account that was a the beneficiary of several retirement accounts and life insurance policies. Mercedes G. Gonzalez

accessing his father's bank accounts his father's bank accounts, retirement accounts, and life insurance policies based on financial information she obtained by accessing Plaintiff's father's protected computer without authorization on December 5, 2021 or around that time frame or thereafter, is made clear by the Petition filed by Attorney Max Lopez filed in December 2022 attached hereto and the petition for reimbursement for expenses filed in the guardianship by Mercedes G. Gonzalez attached hereto. Pg. 57 of the petition shows an entry of the Wells Fargo Intervivos Revocable Living Trust and Bright House Life Insurance policy, non probate assets, being rerouted from Plaintiff's grandmother's bank account to the bank account of Mercedes G. Gonzalez/her daughter, Maria Rudnikas.

67. And the rest of the relevant docket entries filed in the case are on the docket in the Estate of Elias B. Rudnikas; Case # 22-000238-CP-02 and the Guardianship of Marta Santander Rudnikas; Case # 22-001396-GD-02 which this Court can take judicial notice of. Plaintiff has attached majority of the most important ones hereto as they relate to the Federal Computer Fraud and Abuse Act. Lastly and importantly, Plaintiff has direct Article III standing to bring these Federal Computer Fraud and Abuse Act claims because Mercedes also accessed his father's computer without authorization on December 5, 2021 or around that time frame with the intent to create a fake will using the template she obtained on his father's computer and successfully accomplished this by having the current 2014 forged will admitted to probate. Upon information and belief, Mercedes G. Gonzalez also destroyed a 2021 electronic will on his father's computer at the law office that named Plaintiff and Plaintiff's grandmother as beneficiaries, when she accessed his father's computer without authorization at the Law Office in violation of the Federal Computer Fraud and Abuse Act. Plaintiff also meets the U.S Supreme Court's third party standing requirements to advocate for his grandmother due to the conflicted Guardian (who is in the process of being removed in the Guardianship proceedings by Plaintiff); due to his grandmother's incompetency and inability to advocate for herself; and due to the close amicable

relationship he has with his grandmother by virtue of being her grandson and due to the relationship being amicable as noted by Plaintiff's grandmother's happiness in seeing Plaintiff when he visited his grandmother in November 2022. Plaintiff will file the text messages from the Guardian showing how happy his grandmother was after seeing Plaintiff at the November 2022 visit.

## VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030)

68. Plaintiff revers and realleges paragraphs 1-67 as if set forth here fully here in as to Defendants, Mercedes G. Gonzalez Artiles and Maria Mercedes Rudnikas and further alleges the following:

18 U.S.C.§ 1030 (A)(2)(6)-(B) states in pertinent part:

"Whoever-

(2)intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(A)information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B)information from any department or agency of the United States; or

(C)information from any protected computer;

(4)knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)(A)knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B)intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C)intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[2]"

The computers of Plaintiff's father are "protected computers" as defined under this section as they were all connected to the internet at the time they were breached. *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) ("The Act subjects to criminal liability anyone who "intentionally accesses a computer without authorization or exceeds authorized access", and thereby obtains computer information. 18 U.S.C. § 1030(a)(2). It defines the term "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6). Initially, subsection (a)(2)'s prohibition barred accessing only certain financial information. It has since expanded to cover any information from any computer "used in or affecting interstate or foreign commerce or communication." § 1030(e)(2)(B). As a result, the prohibition now applies—at a minimum—**to all information from all computers that connect to the Internet.** §§ 1030(a)(2)(C), (e)(2)(B).") (emphasis added).

The computers of Plaintiff's father located at **3760 NW 6ᵗʰ Street, Miami, FL 33125** and **319 Bird Road** contained all the personal and business financial/health/family information of Plaintiff's father, intellectual property, trade secrets, court records, client files, and various personal passwords, information, data to access email accounts, bank accounts, tax records, different websites, life insurance policies, 401k accounts, retirement accounts, mutual funds, traveling records, templates, programs, applications , etc. In addition, the computers contained the financial information of Plaintiff's grandmother.

Plaintiff's father would use these computers to do everything ,including but not limited to, running his internationally known maritime law practice where Plaintiff's father would use these same computers to provide services to clients throughout the United States and throughout the world in several continents.

His slogan was/is (which was later stolen by Jacinto Gonzalez and Mark Stokes):

"Defendiendo los derechos de los lesionados y los enfermos desde 1982"

Under Florida Law, entitlement to the ownership of these computers of Plaintiff's fathers, vested

to Plaintiff and Plaintiff's grandma under intestate succession, at the time of his father's death,

unofficially on November 16, 2021 and officially on November 17, 2021.

69. Defendant, Mercedes G.   Gonzalez and Maria Mercedes Rudnikas, intentionally

accessed these protected computers  of Plaintiff's father located at 3670 NW 6ᵗʰ Street, Miami,

FL 33125 and located at 319 Bird Road, Coral Gables, FL 33146 ,without authorization and/or

exceeded authorization, continuously, as defined in this section,  beginning shortly after

November 17, 2021 into the present.  This is proven by the following evidence:

First,  Maria Rudnikas's comments to Plaintiff and the girlfriend of Plaintiff's father, Blanca, at

the hospital on November 17, 2021 moments after Plaintiff's father died where she stated, "guys

I'll pay for the funeral. Don't worry about it. I have access to ***dad's accounts***" (referring to the

bank accounts of Plaintiff's father). Upon information and belief, Plaintiff father's never made

Maria Rudnikas a joint account holder, so the authorization ended when Plaintiff's father died

according state and federal banking laws, yet Maria Rudnikas accessed the bank accounts of

Plaintiff's father given that the bank did not yet know Plaintiff's father had died yet and

withdrew thousands of dollars from the account to pay for her own real estate property taxes as

shown by Exhibit which this Court can take judicial notice of since it is a public record. Maria

Rudnikas has no job, yet she wants this Court to believe she paid for $30,000 in real estate

property taxes with her own money.

Second, the fact that Defendants, Maria Rudnikas/Mercedes Gonzalez accessed the computer of

Plaintiff's father without authorization is made clear by the claim filed by Maria Rudnikas in the

estate case attached hereto wherein she provides banks statements of Plaintiff's father before he

died that she accessed on January 14, 2022 before any Letters of Administration were issued.

She attached bank statements for the Synovus business account of the law practice of Plaintiff's

father and bank statements for BankUnited checking account of Plaintiff's father.

Third, evidence that Maria Rudnikas/Mercedes G. Gonzalez accessed the computer of Plaintiff's

father without authorization and/or exceeded authorization is made clear by the filing made by

Attorney Max Lopez showing Mercedes G. Gonzalez accessing his father's email,

rudnikas@yahoo.com, on his protected computer at his law office located at 3670 NW 6th Street, Miami, FL 33125 on December 5, 2021. The filing is attached hereto.

Defendant's had no authorization to access these computers as they had not been granted letters of administration and because Mercedes Gonzalez, did not deposit the will within the 10 days of having knowledge of the testators death. The Florida Legislature made clear that Letters of Administration would only be valid to immune a personal representative/third parties from potential violations of the Federal Computer Fraud and Abuse Act if the Personal Representative deposited the will within days as explained in the first pages of this complaint.

Defendans, Maria Rudnikas and Mercedes G. Gonzalez, accessed these computers without authorization with intent of defrauding and with the intent of obtaining financial information of Plaintiff's father and Plaintiff's grandmother that they successfully attained and with the intent of using one of the templates on his father's computer to forge a fake 2014 will that was admitted into the Probate Court.

Defendants, Maria Rudnikas and Mercedes G. Gonzalez, also accessed these computers of Plaintiff's father without any authorization and altered the information on the computers to delete an electronic 2021 will and/or other evidence that showed that Plaintiff and Plaintiff's grandmother as beneficiaries of a 2021 will/trust where Mercedes G. Gonzalez was not the named Personal Representative rendering the entire probate proceedings void *ab initio*.

Plaintiff and Plaintiff's grandmother have suffered damages well over $100,000.00 because of these illicit violations of the Federal Computer Fraud and Abuse Act by Maria Mercedes Rudnikas/ Mercedes G. Gonzalez. These damages will be proven by third party subpoenas to the Life Insurance Companies and Banks.

Plaintiff and his grandmother are entitled to damages and injunctive relief.

Plaintiff and his grandmother are entitled to injunctive relief because the violations of the CFAA that have occurred here affect his grandmother's healthcare who according to the Guardian did not have enough money to pay fore caretakers.

More specifically, Plaintiff and his grandmother are entitled to an injunction restraining Mercedes G. Gonzalez (Artiles) in her capacity as the Personal Representative of the Estate of Elias B. Rudnikas from selling the commercial property of Plaintiff's father located at 3670 NW 6th Street, Miami, FL 33125 to any buyer including Luis Lester Rodriguez.

## COUNT II: TORTIOUS INTEFERENCE WITH AN INHERITANCE

70. Plaintiff revers and realleges paragraphs 1-67 as if set forth fully herein as to Defendant, Luis Lester Rodriguez, only and further alleges the following:

71. Plaintiff had an expectancy of inheriting the 3670 NW 6th Street, Miami, FL 33125 property from his grandmother at the conclusion of the Guardianship as her intestate beneficiary.

72. Luis Lester Rodriguez, a third party through wrongful tortious conduct he has engaged in with Mercedes G. Gonzalez, has interfered with Plaintiff's expectancy of this inheritance of the 3670 NW 6th Street Commercial Property and has caused Plaintiff's damages as the Probate Court intends to approve of the contract that appears to be a fraudulent conveyance and which gives purported rights to the 3670 NW 6th Street, Miami, FL 33125 commercial property despite the entire proceedings being void *ab intio*.

73. Luis Lester Rodriguez has been aware of the ongoing dispute with that property and the federal litigation that was going to commence as well as the various lis pendens filed on that property by Plaintiff but nonetheless chooses to tortiously interfere with Plaintiff's expectancy of an inheritance as well as his grandmother's expectancy of an inheritance, who currently does not have a real guardian to advocate for her as the current Guardian has a conflict of interest and is in the process of being removed.

74. Plaintiff is entitled to compensatory damages and punitive damages for Luis Lester Rodriguez's intentional misconduct.

75.. Plaintiff is entitled to injunctive relief from Luis Lester Rodriguez.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, prays for an Order:

1) Awarding Plaintiff's compensatory damages against Defendant's Maria Mercedes Rudnikas and Defendant's Mercedes G. Gonzalez for their violations of the Federal Computer Fraud and Abuse Act.

2) An injunction restraining Mercedes G. Gonzalez in her capacity as the Personal Representative of the Estate of Elias B. Rudnikas.

3) An injunction restoring the status quo in the event Mercedes G. Gonzalez, in her capacity as the Personal Representative of the Estate of Elias B. Rudnikas, moves forward with the sale of the 3670 NW 6th Street Commercial Property.

4) An injunction requiring Mercedes G. Gonzalez Artiles, in her capacity as Personal Representative of the Estate of Elias B. Rudnikas, to transfer title to the **3670 NW 6th Street, Miami, FL 33165** commercial property to Benzo Elias Rudnikas as the intestate heir and the 2021 beneficiary of the commercial property through a devise Plaintiff's father left before Mercedes G. Gonzalez committed her violations of the Federal

Computer Fraud and Abuse Act and altered the information on his father's protected computer.

5) An Order Awarding Plaintiff compensatory damages and punitive damages against Luis Lester Rodriguez for the tortious interference with an inheritance claim.

6) An Order awarding Plaintiff any other relief the Court deems just and proper.

## VERIFICATION & DECLARATION PURSUANT TO FLA. STA. 92.525(2)

Petitioner, BENZO ELIAS RUDNIKAS, hereby declares and verifies the following:

I am the Petitioner in the above proceeding.

I have personal knowledge of the facts stated in the foregoing document and if called on to testify, would competently testify as to same.

Under penalties of perjury, I declare and verify that I have read the foregoing Petition and that the facts stated in it are true.

*/s/ Benzo E. Rudnikas*
BENZO E. RUDNIKAS

3/27/23
DATE

*/s/ Benzo E. Rudnikas*
Benzo Elias Rudnikas
benzo.rudnikas@gmail.com
2431 SW 63rd Ave
Miami, FL 33155